IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOHN PUDELSKI, | ) | CASE NO. 1:02CV1441 |
| | ) | |
| Petitioner, | ) | |
| | ) | JUDGE NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE HEMANN |
| JULIUS WILSON, Warden, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Respondent. | ) | Docket #25 |
| | ) | |

This matter is before the magistrate judge pursuant to Local Rule 72.2(b)(2).  Before the court is John Pudelski's ("Pudelski") petition for a writ of habeas corpus filed pursuant to 28 U.S.C. § 2254.  Pudelski is in the custody of the Ohio Department of Rehabilitation and Correction pursuant to a journal entry of sentence in the case of *State of Ohio vs. John J. Pudelski*, Case No. CR 375060 (Cuyahoga County 1999).  For the reasons given below the magistrate judge recommends that the court dismiss Pudelski's petition.

I

Pudelski's infant daughter was found dead on March 29, 1999.  The cause of death was found to be a recently-inflicted skull fracture.  The January 1999 term of the Cuyahoga County grand jury indicted Pudelski on one count of aggravated murder with a death specification because the victim was under 13 years old and, in the alternative, on one count of murder.

Pudelski moved before trial to dismiss the death specification and to dismiss the second count of the indictment.  The court denied both motions.  Pudelski also moved *in limine* to suppress certain evidence at trial.  After a hearing the court granted Pudelski's motion as to most of the evidence but allowed the admission of medical evidence as to the cause of death and allowed the admission of a tape of Pudelski's telephone call to 911.  Upon motion of the prosecution, the court dismissed the death specification.  The court also dismissed Pudelski's motion to prevent the prosecution from referring to Pudelski's daughter as "the victim" and granted his motion to consider the second count as a lesser-included offense of aggravated murder.

Pudelski's trial began on August 23, 1999:

In the state's case at trial, the jury heard testimony from appellant's wife (who was also the mother of the infant victim), medical personnel involved in the delivery and postnatal care of the infant, paramedic and emergency room personnel who responded to the 9-1-1 call regarding the child's death, the county coroner and assistant coroner, and a police officer who investigated the matter.

The mother testified that the infant girl was delivered by Caesarian section on March 17, 1999, and she took her home four days later.  The infant fed every four hours, approximately two and one-half to three ounces of formula or breast milk at each feeding, and behaved normally.  The mother never noticed any injury to the infant's head.

The neonatologist who was present at the infant's birth had noted a caput or bruise under the scalp but above the skull bone on the back of her head.  This is a common injury in newborns and does not have any serious effects on the infant's health.  A pediatrician who saw the infant on March 18 and 20 reported that he saw no abnormalities.  He would not necessarily have noted a caput in his records unless it was an unusual one.  He did not note one here.  Neither physician noted any cephalohematoma, or swelling and bleeding of the tissue under the bone, which would have been a more serious injury.  A home nurse reported that the baby appeared normal and had no bumps or bruises on her head when the nurse saw her on March 23.

The mother testified that the baby behaved normally throughout the day of Sunday, March 28, 1999.  The mother fed her at 8:00 or 9:00 p.m.; the baby consumed

2

almost three and one-half ounces at that time.  The mother put the baby to bed at approximately 9:30 p.m., then took a cough medication, Nyquil, and went to bed herself.  The baby's crib was located in the mother's bedroom.

The mother awakened around 12:00 midnight when the baby cried and got up to feed the child.  Appellant, her husband, was not in the room when the mother awakened but came in and offered to feed the baby, although he normally went to bed at that time.  This was the first time he had fed the baby; he normally paid no attention to her.  The mother then went back to sleep.

The mother awakened at 7:00 a.m. and was immediately concerned because the child had not awakened for her normal feeding at 4:00 a.m.  She went to the crib and found the baby in a corner with her head against the bumper pad.  Her forehead was cold.  The mother picked the baby up and felt for a heart beat but felt none.  She observed a lump on the side of the baby's head.

The mother began to yell for appellant to wake up.  It was unusual for appellant to be sleeping at this time; he was usually up at 6:30 a.m.  Appellant jumped up and took the baby from the mother and left the room, returning with the telephone.  He ordered the mother to leave the bedroom and wait in the living room for paramedics to arrive.

Paramedics came and took the baby to Euclid Hospital.  Appellant and his wife delayed going to the hospital while appellant woke his two daughters from a prior marriage and readied them for school, then took them to his mother's house.  Appellant and his wife proceeded from there to the hospital.

At the hospital, they learned that the baby was dead.  They went into a room to see the body, but appellant would not look at her.  As they waited in the grieving room for the mother's mother to arrive, appellant said to his wife, Please don't leave me.

The coroner and assistant coroner testified that the baby died as a result of a cerebral edema, or swelling of the brain, which was caused by a blunt impact that also caused a fracture of the skull.  They estimated the time of death at approximately 3:00 a.m., and approximately two to three hours after the injury was inflicted.  They opined that she was injured after her midnight feeding.  The assistant coroner testified that the child would have survived if medical attention had been sought immediately after the injury occurred.

The coroner and assistant coroner both opined that the fracture occurred very recently, certainly less than twenty-four hours before the baby's death.  There were no signs of healing around it; the edges of the break were sharp and uncalloused and there was fresh blood at the site.  There were no macrophages (clean-up cells) at the site of the fracture, though there were some in the adjacent scalp.  They opined that these macrophages were present because of the caput that occurred

3

at birth.  There was no evidence the fracture was a new break at the same site as a fracture that had occurred earlier.  Macrophages would have been present at the fracture site if the fracture were not new.  The fracture could not have occurred after death because the body had to have been alive to pump the fresh blood that had oozed around the area.

The coroner opined that the death was a homicide.  She reached this conclusion because the child had a fracture that was not a birth injury, she could not have caused the fracture herself, and nothing accidental had happened, so the injury had to have been inflicted.

Detective Raymond Jorz testified that appellant and his wife came in to the police station together voluntarily on March 31, 1999, and were interviewed separately. Appellant was interviewed by Detective Jorz and Lieutenant Brooks.  They asked appellant whether the baby had suffered any accidental injuries, and appellant said she had not.  Appellant related that he had fed the baby around midnight and stayed up with her until approximately 1:30 a.m., then put her in her crib after she went to sleep.  He went to bed himself and awakened at approximately 3:30 a.m., used the bathroom, then returned to bed.  He did not check on the baby at that time.  His wife woke him the following morning after she found the baby cold and unresponsive.

When police informed appellant that the baby had a skull fracture, appellant suggested that the fracture was caused by the emergency medical technicians or that the coroner was examining the wrong child.  He denied knowledge of any injury.

*State v. Pudelski*, 2001 WL 259215, at *1-*3 (Ohio App. March 15, 2001).  The prosecution

challenged Pudelski to present evidence tending to support the existence of an earlier

injury.  Pudelski failed to do so, and the prosecution emphasized this point in its closing

arguments.

A jury found Pudelski not guilty of aggravated murder but guilty of murder.  The court

denied Pudelski's motion for a post-judgment verdict of acquittal or, in the alternative, for

a new trial.  On September 29, 1999 the court sentenced Pudelski to 15 years to life

imprisonment.

Pudelski filed a timely motion for a new trial on October 1, 1999.  He claimed that

newly-discovered photographic evidence showed that a bruise resulting from the injury

4

which killed his daughter was present ten days before the child's death, contrary to testimony at trial.  The court denied the motion on December 17, 1999.

Pudelski filed a notice of appeal on October 28, 1999.  He was represented on appeal by the same attorneys who had represented him at trial.  The appellate court granted Pudelski delays to supplement his brief to appeal rulings on his post-conviction motion, but it struck a brief which exceeded page limitations.  Pudelski asserted eight assignments of error in his appeal:

1. THE TRIAL COURT COMMITTED PREJUDICIAL ERROR IN OVERRULING THE DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT OF ACQUITTAL.

2. THE DEFENDANT'S CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

3. THE DEFENDANT'S CONVICTION IS BASED UPON THE IMPERMISSIBLE STACKING OF INFERENCES.

4. THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTIONS FOR A NEW TRIAL.

5. THE TRIAL COURT COMMITTED PREJUDICIAL ERRORS IN ITS EVIDENTIARY RULINGS.

6. PROSECUTORIAL MISCONDUCT DURING THE COURSE OF THE TRIAL DEPRIVED THE DEFENDANT OF HIS CONSTITUTIONAL RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL.

7. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION TO SUPPRESS.

8. DEATH RESULTING FROM FELONIOUS ASSAULT CONSTITUTES INVOLUNTARY MANSLAUGHTER WHICH PRECLUDES AN INDICTMENT FOR MURDER.

The appellate court announced an opinion affirming the judgment of the trial court on March 15, 2001 and filed the opinion on April 3, 2001.  Pudelski filed a timely motion for

5

reconsideration pursuant to Ohio App. R. 26(A), contending that the appellate court had denied assignments of error 4 and 6 without sufficient explanation.  The appellate court denied the motion for reconsideration on October 10, 2001.

Pudelski, again represented by his trial attorneys, filed a timely notice of appeal in the Ohio Supreme Court.  Pudelski's memorandum in support of jurisdiction asserted four propositions of law:

Proposition of Law No. 1:

A Finding of Prosecutorial Misconduct Will Result in the Reversal of a Conviction Unless the State Proves, By a Preponderance of Evidence, that Such Misconduct Had No Effect Upon the Jury's Deliberations.

Proposition of Law No. 2:

A New Trial Based upon Newly Discovered Evidence Requires Proof of New Evidence, Material to the Defense, Which the Defendant Could Not, with Reasonable Diligence, Have Been Discovered [sic] and Produced at Trial.

Proposition of Law No. 3:

An Appellate Court Shall Determine and Give Meaningful Reasons in Writing Upon All Assignments of Error Raised on Appeal.

Proposition of Law No. 4:

Opinion Testimony is Admissible When the Witness Has Been Presented With Facts or Data Within the Personal Knowledge of the Witness or the Facts or Data Have Been Admitted in Evidence.

The Ohio Supreme Court denied leave to appeal and dismissed the appeal as not involving any substantial constitutional question on July 25, 2001.

On November 8, 2001 Pudelski filed *pro se* an application to reopen his appeal pursuant to Ohio App. R. 26(B).  Pudelski failed to include in his application, as required by the rule, arguments or assignments of error not considered by the appellate court or

6

assignments of error considered on an incomplete record due to appellate counsel's deficient performance.  The court denied his application on November 9, 2001.  On February 3, 2002 Pudelski moved to exceed the 10-page limit for an application, and the court denied the motion as moot on February 15, 2002.

On February 21, 2002 Pudelski moved *pro se* in the trial court for an order requiring the Department of Children and Family Services to release to him all records related to his former wife and surviving daughters.  He also requested an order requiring that he be provided with a copy of his ex-wife's statement to the Euclid Police Department.  Pudelski stated that he intended to use these materials in writing a petition for post-conviction relief.  The court denied Pudelski's motion on March 21, 2002.

Pudelski filed a petition for a federal writ of habeas corpus in this court on July 26, 2002.  Pudelski claims five grounds for relief:

A.   Ground one:  The Trial Court Erred in Denying Petitioner's Motions for New Trial Based on Newly Discovered Evidence.

B.   Ground two:  The Trial Court Erred in Prohibiting Petitioner and His Trial Counsel from Having Access to the Files and Records upon Which the State's Expert Witness Relied in Her Expert Testimony.

C.   Ground three:  The Trial Court Erred in Allowing the Prosecution's Witness, Assistant County Coroner, Dr. Joseph Felo to Testify Relative to His Unscientific and Personal Research in a Manner So as to Present Such Research as Scientific Evidence.

D.   Ground four:  The Trial Court Erred in Denying Petitioner's Motion to Dismiss Count 2 of the Indictment -- as Death Resulting from Felonious Assault Constitutes Involuntary Manslaughter in Violation of R.C. 2903.04(a), Which Precludes an Indictment for Murder under R.C. 2903.02(b) under Ohio Law.

E.   Ground five:  The Trial Court Erred in Refusing the Jury's Request - Based upon Inconvenience to the Court - to View Microscope Slides Which Had Been Admitted into Evidence and Had Been Delivered to the Jury for Use During its Deliberations.

7

Pudelski also claims actual innocence as a ground for relief.  Respondent filed an Answer on October 18, 2002 (Docket #13).

On November 12, 2002 Pudelski moved for a stay of the proceedings to allow him to reopen the appeal of his criminal conviction and exhaust all issues relevant to his habeas petition.  The court granted Pudelski's motion on March 20, 2003, staying consideration of Pudelski's first four grounds for relief and dismissing the fifth ground to allow Pudelski to exhaust state remedies.

On April 21, 2003 Pudelski filed a motion for postconviction relief in the trial court. Pudelski contended that he was denied due process of law when the trial court refused to provide the jury a microscope to view slides admitted as evidence at trial and was denied effective assistance of counsel when counsel did not object to the court's refusal to provide a microscope and did not raise the issue on appeal.  On September 15,  2003 the trial court dismissed Pudelski's petition as untimely and found that the issues he raised were barred by *res judicata.*  The trial court failed to issue findings of fact and conclusions of law with its decision.

Pudelski timely appealed the decision of the trial court to the state court of appeals. The state appellate court dismissed Pudelski's appeal for failure to include the trial court's findings of fact and conclusions of law with his appeal.  Pudelski refiled his motion for postconviction relief in the trial court.  On February 26, 2005 the trial court again dismissed his appeal, this time adopting by reference findings of fact and conclusions of law.

Pudelski timely appealed the trial court's decision.  He raised four assignments of error on appeal:

Court below erred in dismissing Appellant's post conviction petition where appellant

8

was denied due process of law when trial court refused to provide jury a microscope to view demonstrative slide evidence admitted at trial.

Court below erred in dismissing appellant's post conviction petition where appellant was denied effective assistance counsel [sic] when his counsel failed to object to the court's refusal to provide the jury a microscope to view demonstrative slide evidence admitted at trial and failed to properly appeal the issue.

The trial court erred in dismissing Appellant's post conviction petition on grounds of res judicata where appellant was represented by the same trial counsel and Appellant's motion to re-open was denied.

The trial court violated the Appellant's Fifth, Sixth and Fourteenth Amendment rights in dismissing Appellant's post conviction petition.

On February 23, 2005 the state appellate court upheld the trial court's determination that Pudelski's petition had been untimely and found that the trial court's refusal to provide the jury a microscope was not reversible error.

Pudelski timely appealed the state appellate court's decision to the Ohio Supreme Court.  On August 2, 2006 the Ohio Supreme Court dismissed Pudelski's appeal.

Pudelski filed a Traverse on August 28, 2006 (Docket #34) and moved on December 12, 2006 to lift the stay of proceedings.  On February 20, 2007 the court granted Pudelski's motion to lift its stay.  Thus, the petition is ready for decision.

II

A.    *Jurisdiction*

Writs of habeas corpus may be granted by a district court within its respective jurisdiction:

Where an application for a writ of habeas corpus is made by  person in custody under the judgment and sentence of a State court of a State which contains two or more Federal judicial districts, the application may be filed in the district court for the district within which the State court was held which convicted and sentenced him and each of such district courts shall have concurrent jurisdiction to entertain the application.

28 U.S.C. § 2241(a) and (d).

Title 28 U.S.C. § 2254(a) provides in relevant part, "[A] district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  Federal jurisdiction attaches on a petition for a writ of habeas corpus when an petitioner in custody files for the writ.

Pudelski was sentenced within the geographic jurisdiction of the court.  This court has jurisdiction over Pudelski's petition.

Respondent argues that the court does not have jurisdiction over Pudelski's first ground for relief because it presents a question of state law and does not claim that Pudelski is in custody in violation of the Constitution or laws or treaties of the United States.  For this reason, respondent argues, the court does not have jurisdiction over Pudelski's first ground for relief.

Respondent errs.  In his brief in support of his petition, Pudelski states his first ground for relief as follows:

> PETITIONER WAS DENIED DUE PROCESS OF LAW AND HIS CONVICTION VIOLATES FUNDAMENTAL FAIRNESS BECAUSE THE TRIAL COURT IMPROPERLY DEEMED NEW, DIRECT PHOTOGRAPHIC EVIDENCE SUPPORTING THE THEORY OF THE DEFENSE AS CUMULATIVE TO EXPERT TESTIMONY EVEN THOUGH THERE WAS NO SUCH PRIOR DIRECT EVIDENCE THAT THE DECEASED INFANT HAD SUFFERED A SEVERE HEAD INJURY AT BIRTH IN THE EXACT SAME LOCATION AS THE HEAD INJURY WHICH WAS THE CAUSE OF HER DEATH.

Brief in Support of Petition for Habeas Corpus ("Brief"; Docket #3), p. 2.  Pudelski clearly frames his first ground for relief as a federal claim.

Respondent is correct, however, in arguing that Pudelski cannot be granted relief

upon this ground.  Pudelski's first ground for relief alleges a federal violation in the trial court's adjudication of his motion for a new trial pursuant to Ohio R. Crim. P. 33(A)(6). Such a motion initiates a post-conviction proceeding.  The Sixth Circuit has held that other than certain alleged errors in a first appeal of right, the writ is not available for alleged errors in state post-conviction proceedings:

> The writ, traditionally, has been available when the petitioner is in custody or threatened with custody and the detention is related to a claimed constitutional violation.  In *Preiser v. Rodriguez,* 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), the Supreme Court analyzed the scope of the applicability of the writ of habeas corpus, stating:
>
> > It is clear, not only from the language of ... § 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody.  411 U.S. at 484, 93 S.Ct. at 1833.
>
> *          *          *          *          *
>
> [T]he writ is not the proper means by which prisoners should challenge errors or deficiencies in state post-conviction proceedings . . . because the claims address collateral matters and not the underlying state conviction giving rise to the prisoner's incarceration. . ."[E]ven where there may be some error in state post-conviction proceedings, this would not entitle appellant to federal habeas corpus relief since appellant's claim here represents an attack on a proceeding collateral to detention of appellant and not on the detention itself."  [*Williams v. Missouri*, 640 F.2d 140, 144 (8th Cir.)] . . . [T]he petition must directly dispute the fact or duration of the confinement.  Though the *ultimate* goal in this case . . . is release from confinement, the result of habeas review of the specific issues before us is not in any way related to the confinement.  We decline to allow the scope of the writ to reach this second tier of complaints about deficiencies in state post-conviction proceedings.

*Kirby v. Dutton*, 794 F.2d 245, 246-47 (6th Cir. 1986).

Because the court can not award habeas relief based on Pudelski's first ground for relief, the magistrate judge recommends that the court dismiss Pudelski's claim that he was denied due process and fundamental fairness when the trial court failed to grant his motion

for a new trial.

B.    *Evidentiary hearing*

The habeas corpus statute authorizes an evidentiary hearing in limited circumstances when the factual basis of a claim has not been adequately developed in state court proceedings.  28 U.S.C. § 2254(e)(2).  There is no need for an evidentiary hearing in the instant case.  All Pudelski's claims involve legal issues which can be independently resolved without additional factual inquiry.

C.    *Exhaustion of state remedies*

A state prisoner must exhaust all available state remedies or have no remaining state remedies available prior to seeking review of a conviction via federal habeas corpus. 28 U.S.C. § 2254(b) and (c); *Castillo v. Peoples*, 489 U.S. 346, 349 (1989); *Riggins v. Macklin*, 936 F.2d 790, 793 (6th Cir. 1991).  If any state procedures for relief remain available, the petitioner has not exhausted state remedies.  *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994).

A petitioner must fairly present any claims to the state courts in a constitutional context properly to exhaust state remedies.  *Anderson v. Harless*, 489 U.S. 4 (1982); *Picard v. Connor*, 404 U.S. 270 (1971); *Shoultes v. Laidlaw*, 886 F.2d 114, 117 (6th Cir. 1989).  Federal courts lack jurisdiction to consider any claim that was not fairly presented to the state courts.  *Newton v. Million,* 349 F.3d 873, 877 (6th Cir. 2003).  "[O]nce the federal claim has been fairly presented to the state courts, the exhaustion requirement is satisfied."  *Picard*, 404 U.S. at 275; *see also Harris v. Reeves*, 794 F.2d 1168, 1174 (6th Cir. 1986).  The exhaustion requirement is properly satisfied when the highest court in the state in which petitioner was convicted has been given a full and fair opportunity to rule on

12

all of the petitioner's claims.  *Manning v. Alexander*, 912 F.2d 878, 881-83 (6th Cir. 1990).

Pudelski has no remaining state remedies.  For this reason, his claims have been exhausted.

D.    *Procedural default*

Respondent argues that Pudelski has procedurally defaulted his second, third, fourth, and fifth grounds for relief.  Reasons of federalism and comity generally bar federal habeas corpus review of "contentions of federal law . . .  not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure."  *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).  When a petitioner

> has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice.

*Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

If the state argues that a petitioner has procedurally defaulted, the court must conduct a four-step analysis to determine whether the petitioner has indeed defaulted and, if so, whether the procedural default may be excused:

> First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. . . . Second, the court must decide whether the state courts actually enforced the state procedural sanction.  . . . Third, the court must decide whether the state procedural forfeiture is an  "adequate and independent" state ground on which the state can rely to foreclose review of a federal constitutional claim. . . . This question generally will involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. . . . [Fourth, if] the court determines that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner must demonstrate . . . that there was "cause" for him to not follow the procedural rule and that he was actually prejudiced by the alleged constitutional error.

13

*Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

A federal court has a duty to consider the merits of procedurally defaulted claims, however, when failure to do so would result in a "fundamental miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 320-21 (1995); *see also Sawyer v. Whitley,* 505 U.S. 333, 339-340 (1992); *McCleskey v. Zant*, 499 U.S. 467, 495 (1991); *Smith v. Murray,* 477 U.S. 527, 537 (1986); *Murray v. Carrier,* 477 U.S. 478, 495-96 (1986); *Kuhlmann v. Wilson,* 477 U.S. 436, 452 (1986); *Engle v. Isaac,* 456 U.S. 107, 135 (1982).  The exception for a fundamental miscarriage of justice is explicitly tied to the petitioner's innocence to ensure that the exception is applied only to extraordinary cases while ensuring that it is available to those who are truly deserving.  *Schlup*, 513 U.S. at 321; *Carrier,* 477 U.S. at 496.  A colorable claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial." *Schlup*, 513 U.S. at 324.  The petitioner must show that in light of the new evidence and presuming a conscientious jury, "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." *Id.* at 327.  A colorable claim of actual innocence requires a habeas court to consider the merits of procedurally defaulted claims.

In the instant case, Pudelski argues that he is actually innocent of the crime of which he was convicted.  Pudelski adduces in support of his claim of actual innocence a photograph of the fatally injured child taken before Pudelski was alleged to have struck the child and showing a visible injury at the site of the infant's fatal skull fracture.  He also presents affidavits of three medical experts who testified for the defense at Pudelski's trial,

14

asserting that had the photograph been available to them at trial it would have provided certain proof of the existence of a birth trauma at the site of the fatal fracture.  Given the centrality of such evidence to the theory of the defense at trial and to the prosecution's challenge in closing arguments to produce evidence of an injury earlier than the evening of the child's death, such a photograph must be said to make Pudelski's claims of innocence at least colorable.  For this reason the magistrate judge recommends that the court excuse any procedural defaults and examine the merits of Pudelski's five grounds for relief.

III

The Antiterrorism and Effective Death Penalty Act of 1996 (the "AEDPA") altered the standard of review that a federal court must apply when deciding whether to grant a writ of habeas corpus.  As amended, 28 U.S.C. § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Under the current deferential standard of review, a writ of habeas corpus may issue only if the state court's decision is contrary to clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence.  *Williams v. Taylor*, 529 U.S. 362, 379-90 (2000); *Miller v. Francis*, 269 F.3d 609, 613-14 (6th Cir. 2001).  Law is "clearly established" only by holdings of the Supreme Court, not its dicta, and the law must be clearly established at the time of the petitioner's conviction.  *Harris v. Stovall*, 212 F.3d

15

940, 943-44 (6th Cir. 2000).

Courts must give independent meaning to the phrases "contrary to" and "unreasonable application of" in § 2254(d)(1):

> Section 2254(d)(1) defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court.  Under the statute, a federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "*contrary to* ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved an unreasonable application of* ... clearly established Federal law, as determined by the Supreme Court of the United States."

*Williams*, 529 U.S. at 405 (emphasis added by the quoting court).  A decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by Supreme Court holdings on a question of law or if it faces a set of facts materially indistinguishable from relevant Supreme Court precedent and still arrives at an opposite result.  *Id.*  "A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases."  *Id.*  A decision involves an unreasonable application of federal law only if the deciding court correctly identifies the legal principle at issue and unreasonably applies it to the facts of the case at hand.  *Doan v. Brigano*, 237 F.3d 722, 729-31 (2001).  If a court fails to identify the correct legal principal at issue, the "unreasonable application of" clause does not apply.  *Id.* at 730.

 "[A] determination of a factual issue made by a State court shall be presumed to be correct."  28 U.S.C. § 2254(e)(1).  The petitioner, however, may rebut "the presumption of correctness by clear and convincing evidence."  *Id.*  The magistrate judge will consider Pudelski's remaining claims under the deferential standard of review accorded the state court's determination of a prisoner's constitutional claims.

16

A.    Ground two: The trial court denied Pudelski due process and fundamental fairness
      in denying him access to files and records on which the state's expert witness relied
      in her testimony

Pudelski argues in his second ground for relief that he was denied due process and

fundamental fairness when the court refused to require the state of Ohio to turn over to

Pudelski police reports relied on by its expert witness, Chief County Coroner Elizabeth

Balraj ("Balraj"), in giving expert testimony at trial. According to Pudelski, the failure to give

him access to the reports violated Ohio Evid. R. 704 and deprived him of exculpatory

information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

The right to a fair trial is a right implicit in the due process clauses of the Fifth and

Fourteenth Amendments. *See United States v. Agurs*, 427 U.S. 97, 107 (1976). The

analysis of alleged violations of the right is identical under either amendment. *Id.* "A fair

trial in a fair tribunal is a basic requirement of due process." *In re Murchison*, 349 U.S. 133,

136 (1955). "[A] fair trial is one in which evidence subject to adversarial testing is

presented to an impartial tribunal for resolution of issues defined in advance of the

proceeding." *Strickland v. Washington*, 466 U.S. 668, 684 (1984). "Every procedure which

would offer a possible temptation to the average man as a judge . . . not to hold the balance

nice, clear, and true between the State and the accused denies the latter due process of

law." *Murchison*, 349 U.S. at 136 (quoting *Tumey v. State of Ohio*, 273 U.S. 510, 532

(1927)).

Not all violations of the right to a fair trial, however, entitle a petitioner to habeas

relief. In *Brecht v. Abrahamson,* 507 U.S. 619 (1993), the Supreme Court held that a court

17

considering a collateral review of a conviction should weigh constitutional "trial error"[1] by (1) evaluating the error in the context of the entire record; (2) asking whether the trial error had a substantial and injurious effect on the jury's verdict, and (3) granting relief only if there is grave doubt about whether the error was harmless.  *id.* at 638.  A court may not grant habeas relief unless it believes that the error had a substantial and injurious effect on the jury's verdict.  *Kyles v. Whitley*, 514 U.S. 419, 436 (1995).

In the instant case Balraj testified that she concluded that the infant's death was a homicide, rather than an accident, in part as a result of information in a police report that the infant had not suffered any accident prior to her death.  Transcript of proceedings ("Tr."), Answer, Exh. 54, pp. 929, 980-86.  Pudelski's counsel requested a copy of the police report upon which Balraj relied in coming to her expert opinion that the death was a homicide.  After a *voir dire* of Balraj, the trial court ruled that Pudelski was not entitled to a copy of the police report.

Even if it is assumed that the failure to give Pudelski access to the police report

---

[1]  According to the Supreme Court,

[t]rial error "occur[s] during the presentation of the case to the jury," and is amenable to harmless-error analysis because it "may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial]."  *Id.,* at 307-308 [citing *Arizona v. Fulminante,* 499 U.S. 279, 307 (1991)].  At the other end of the spectrum of constitutional errors lie "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards."  *Id.,* at 309. The existence of such defects--deprivation of the right to counsel, for example--requires automatic reversal of the conviction because they infect the entire trial process.  See *id.,* at 309-310.  Since our landmark decision in *Chapman v. California,* 386 U.S. 18 (1967), we have applied the harmless-beyond-a-reasonable-doubt standard in reviewing claims of constitutional error of the trial type.

*Brecht*, 507 U.S. at 629-30.

violated Ohio Evid. R. 704, it cannot be concluded that denying Pudelski access to the report also denied him due process and a fair trial. As Balraj testified, she concluded that the death was a homicide in part because the police found no accident which could have resulted in the infant's fatal fracture. One of the witnesses for the state at Pudelski's trial was Detective Raymond Jorz ("Jorz"), who investigated the victim's death. Jorz's testimony on direct and cross examination included a description of the investigation, the results obtained by the investigation, and the conclusions reached by the police from those results. Tr. at 791-860. Jorz's testimony on re-cross examination also included a reading of the affidavit he submitted to obtain a warrant to search Pudelski's home for evidence related to the homicide of Pudelski's daughter. Tr. at 900-05. In performing the investigation and making the affidavit, Jorz primarily relied on information from Pudelski and Pudelski's wife, Sarah Pudelski ("S. Pudelski"), and possibly upon information from Dr. Joseph Felo ("Felo"), a deputy coroner for Cuyahoga County, Ohio, and from paramedics responding to Pudelski's emergency call following his wife's discovery of his daughter's body. S. Pudelski, Felo, and one of the paramedics responding to the emergency call testified at the trial. The testimony of Jorz regarding the investigation indicated that the investigation found no reason to believe the victim had suffered an accident prior to her death. Pudelski's own statements to Jorz during the investigation confirmed this conclusion. Given that Balraj's expert opinion relied on the report only to eliminate accident as a cause of death, that the detective investigating the infant's death testified regarding the nature and conclusions of the report, that all sources of information used in the investigation were available for examination at trial, and that the defendant's own statements confirmed the key point on which Balraj relied in concluding that the infant's death was a homicide, no reasonable

19

person can conclude that the failure to give Pudelski access to the report had a substantial and injurious effect on the jury's verdict.

Pudelski's contention that failure to grant him access to the police report violated the holding in *Brady* is similarly without merit.  *Brady* and its progeny stand for the proposition that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  There is, however, no indication that the police report contained any information favorable to Pudelski.  Rather, the report incriminated Pudelski by eliminating accident as a possible cause of the infant's injury.  *Brady* did not require, therefore, that the police report be given to Pudelski.

Pudelski reasons in the following fashion that the report must have contained some information favorable to him:

> Upon receiving the case file and performing the autopsy, Assistant County Coroner Dr. Joseph Felo testified that he had no information from which he could conclude the blunt force trauma was intentional, accidental, or other.  Similarly, the police, after having concluded their investigation and arresting Petitioner for murder, had no information from which to conclude the infant's death resulted from criminal activity.
> Chief County Coroner Dr. Balraj testified, contrarily, however, that she reviewed and relied upon the police information in arriving at her opinions relative to the death of Petitioner's infant daughter.
> In light of these instances of disparate testimony, the trial court committed prejudicial, reversible error by refusing to permit defense counsel access to the underlying police reports.  It goes without saying that when 1) the police say that they had no evidence of criminal activity until the Coroner said the death was a homicide, and 2) the Coroner says she had no evidence of criminal activity until reviewing the police reports, that those police reports will diminish the credibility of at least one of the State's witnesses.  Both stories can't be true.  Therefore, the police reports are exculpatory, and crucial to Petitioner's defense case.

Brief at 12.  Of course, Pudelski ignores the third alternative:  that even though neither the

20

information gathered by the coroner nor the information gathered by the police *independently* was sufficient to conclude that a crime occurred, both sets of information *together* were sufficient to conclude that a crime had been committed and that Pudelski was its author. Pudelski's conclusion that the police report must contain exculpatory information is erroneous.

No reasonable person can conclude that the failure to give Pudelski access to the police report had a substantial and injurious effect on the jury's verdict, and *Brady* did not require the court to give Pudelski access to the police report in question. For these reasons, the magistrate judge recommends that the court overrule Pudelski's second ground for relief.

B.  *Ground three: The trial court erred in allowing the prosecution's witness, Assistant County Coroner, Dr. Joseph Felo, to testify about his unscientific research as though it were scientific evidence*

Pudelski argues in his third ground for relief that the trial court erred in allowing Felo to testify about his unscientific research as though it were scientific evidence. Presumably, Pudelski is asserting that this violated his right to due process by denying him a fair trial.

The state appellate court reviewing this assignment of error on direct appeal made the following relevant findings of fact and conclusions of law:

> [A]ppellant claims the court erred by allowing the assistant coroner, Dr. Felo, to testify about a research project he performed. At trial, the assistant coroner used demonstrative exhibits from other files in the coroner's office to show the healing processes that take place to injuries as they get older, for purposes of comparison to the recent injury that had been inflicted on this infant. Appellant contends that the assistant coroner did not conduct the research project that led to this evidence in a manner calculated to yield accurate results and, therefore, the court should have excluded the resulting exhibits.
>
> Appellant would have this court treat these exhibits as a kind of scientific test result that forms the basis of an expert opinion; however, Dr. Felo clearly did not rely on

21

> these exhibits as a basis for his opinion, so the manner in which he found them is irrelevant.  Their purpose was to show the healing processes that would be evident in injuries of the type the infant suffered if the injuries had occurred earlier.  As such, they were proper demonstrative exhibits.

*Pudelski*, 2001 WL 259215 at *6.

Pudelski does not address the state appellate court's findings of fact and conclusions of law and does not show by clear and convincing evidence that they were erroneous.  Pudelski also makes no effort to show that the alleged trial error had a substantial and injurious effect on the jury's verdict.  The court must conclude, therefore, that there was no error and that even if there had been error, Pudelski was not substantially prejudiced by it.  Thus, the trial court did not violate Pudelski's right to due process.  For these reasons the magistrate judge recommends that the court overrule Pudelski's third ground for relief.

C.    *Ground four:  The trial court erred in denying Pudelski's motion to dismiss the count of Death Resulting from Felonious Assault in violation of Ohio Rev. Code § 2903.04(a)*

Pudelski contends that he was denied due process when the trial court denied his motion to dismiss the count of Death Resulting from Felonious Assault.  In addressing this assignment of error during Pudelski's direct appeal, the state appellate court made the following relevant findings of fact and conclusions of law:

> Appellant was charged with having caused the death of another as a proximate result of committing felonious assault, in violation of R.C. 2903.02(B).  R.C. 2903.02(B) provides:
>
> No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code.
>
> Appellant claims that causing the death of another by means of felonious assault is

22

involuntary manslaughter and that the state is prohibited by the plain language of R.C. 2903.02(B) and R.C. 2901.04(A) from bootstrapping involuntary manslaughter into a charge of murder. Involuntary manslaughter is defined as causing the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony.  R.C. 2903.04(A).

While we agree that the offense with which appellant was charged could also constitute involuntary manslaughter, this fact alone did not preclude the state from charging appellant with the higher offense of murder.  The elements of a murder charge include more specific requirements as to the degree and nature of the underlying felony than does the offense of involuntary manslaughter.  Rather than bootstrapping an involuntary manslaughter charge into murder, the involuntary manslaughter charge may be considered a lesser-included offense of murder.  *State v. Kidder* (1987), 32 Ohio St.3d 279, 282, 513 N.E.2d 311.  Therefore, the eighth assignment of error is overruled.

*Pudelski*, 2001 WL 259215 at *8.

Pudelski does not demonstrate by clear and convincing evidence that the state appellate court's findings were erroneous.  Moreover, Pudelski cites no Supreme Court holding on materially indistinguishable facts that the structure of the charges against him violated his right to due process.  Indeed, Pudelski cites only state law in his argument and does nothing to demonstrate a federal constitutional violation.  For these reasons the magistrate judge recommends that the court overrule Pudelski's fourth ground for relief.

D.     *Ground five: The trial court erred in refusing the jury's request for a microscope to view slides which had been admitted into evidence*

Pudelski argues that he was denied a fair trial in violation of his right to due process when the trial court refused the jury's request during its deliberations for a microscope to view slides containing samples of human tissue.  The state appellate court addressed this assignment of error on appeal of the trial court's denial of Pudelski's motion for postconviction relief.  At that time the state appellate court made the following relevant findings of fact and conclusions of law:

23

{¶ 33} At trial, during jury deliberations, the jury sought use of a microscope to view tissue sample slides of the victim that had been marked and admitted into evidence. To be viewed, the slides required the use of a large, unique microscope that was not readily available.

{¶ 34} The jurors, through the foreperson, submitted two written requests on the issue to the trial court.  The questions, as quoted in the appellant's brief from the transcript, are as follows:

{¶ 35} "I received the following message from the jury, and I quote, we are requesting, with your permission, a microscope to view the slide evidence period. Thanking you in advance for your time and cooperation."

{¶ 36} "The court has another message, which I will read, that the slides were admitted into evidence, and the questions that the foreman asks, and it's a valid question, is how are we to view these, and he adds we have a trained and certified microbiologist among us."

{¶ 37} At trial, in an effort to avoid the appearance of prejudice to either side, both the prosecutor and counsel for the defendant agreed to allow the court to address this issue.  Thus responsibility for denying the jury the use of the microscope was focused on the trial court rather than on the parties.

{¶ 38} The trial court informed the jury on the record that it denied the jury a microscope in part because the jury indicated in the second note that the jury had a "trained and certified microbiologist among us."  The court, in part, told the jury: "Now, frankly, that's one of the reasons that I'm declining to produce this microscope.  Because the jury is the jury. And the jury is not an expert, per se."

{¶ 39} The court added: "So what does the jury have in this case?  It has the expert testimony of, I believe, six experts on various points.  The jury has its collective recollection, and although the notes are not evidence, the notes have a value to assist the jury in recalling its recollection of the evidence."  These facts demonstrate the court was legitimately concerned about the jury taking on an investigatory role. Ohio law precludes independent investigations by jurors. R.C. 2945.79(A) and (B) expressly outline juror misconduct as a reason for a new trial:

{¶ 40} "(A) Irregularity in the proceedings of the court, *jury,* prosecuting attorney, or the witnesses for the state, or for any order of the court, or abuse of discretion by which the defendant was prevented from having a fair trial;

{¶ 41} "(B) Misconduct of the *jury,* prosecuting attorney, or the witnesses for the state[.]" (Emphasis added.)

{¶ 42} In analyzing a case of alleged juror misconduct, a trial court would have to

24

engage in a two-tier inquiry.  First, it would have to determine whether juror misconduct occurred.  If so, it would then have to determine if the misconduct materially affected the defendant's substantial rights.  *State v. Jerido,* (Feb. 26, 1998), Cuyahoga App. No. 72327.  Further, OJI Section 402.21 recommends the following instruction involving investigation by the jurors to avoid the risk of misconduct:

{¶ 43} "WARNING.  You may not investigate or attempt to obtain additional information on this case outside the courtroom. It is highly improper for anyone of you to attempt to do so."

{¶ 44} Here, the trial court was properly precluding the jury from conducting an improper investigation.  The record reveals that there were other grounds stated for the court's concern.  On the record, the prosecutor noted that the slides in question did not have identifiable marks that would orient a viewer as to what was being observed.  The prosecutor outlined this problem:

{¶ 45} "Judge, it's the understanding of the state that nowhere on any of the slides is the orientation reflected so that even a physician would have trouble recognizing what portion of the body you are looking at."

{¶ 46} In light of the fact that the slides were presented and testified to by an expert, the jury had the evidence before them to consider.  Allowing the jurors to conduct an independent investigation in the jury room with a "trained and certified microbiologist" could have so tainted the expert's testimony and prejudiced the role of the jury that the trial court's decision to preclude the use of a microscope was not error.

*State v. Pudelski*, 2006 WL 440271, at *5-*6 (Ohio App. Feb. 23, 2006).

Pudelski does not address the particular concerns of the trial court and the state appellate court in ensuring that the jury was not tainted by an independent investigation resting on the supposed expertise of one of its members.  Because he does not address this issue, Pudelski fails to demonstrate that the state appellate court erred in making its findings of fact and conclusions of law.  Pudelski also cites no Supreme Court holding on materially indistinguishable facts that would require the conclusion that the refusal to

25

provide the jury a microscope deprived Pudelski of a fundamentally fair trial.[2]  Finally, even

if the court did err in not giving the jury access to a microscope, Pudelski does nothing to

demonstrate that he was substantially prejudiced by this alleged trial error.  For these

reasons the magistrate judge recommends that the court overrule Pudelski's fifth ground

for relief.

IV

For the reasons given above the magistrate judge recommends that the court deny

Pudelski's petition for a writ of habeas corpus.


Date:  April 24, 2007               /s/Patricia A. Hemann
                                    Patricia A. Hemann
                                    United States Magistrate Judge

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).

---

[2]  Pudelski cites Fed. Evid. R. 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), for the proposition that when an expert witness testifies that a particular slide supports a fact, it is necessary that a jury be able to examine that slide with a microscope to confirm that the testimony of the expert is based upon sufficient data.  First, Fed. Evid. R. 702 has no relevance to this case.  The federal evidentiary rules apply only to federal cases.  Pudelski's case was a state case, conducted pursuant to *Ohio's* evidentiary rules.  Second, *Daubert* does not stand for the proposition that a jury must be allowed to examine the data on which the expert's opinion rested to determine whether the opinion was adequately warranted by the evidence.  *Daubert* simply requires that under certain circumstances the trier of fact should be allowed to hear scientific opinion.  Third, even if *Daubert* did stand for the proposition claimed by Pudelski, *Daubert* did not involve the problem of potential jury contamination, which distinguishes it from Pudelski's case.  In short, Pudelski cites no Supreme Court holding applicable to the facts of his case.